Limited v. Wheeler Okay, Mr. Rutherford. May it please the Court, my name is Brian Rutherford and please counsel, I represent Appellant Bert Wheeler. We've raised six issues in our brief. During my time this morning, I'd like to focus primarily on the rendition issues because those I feel are the most important for this Court to address. Judge Rievele, earlier this morning, you mentioned why. Why are we here? My first issue is the Economic Loss Doctrine. It's an issue that's been developed over the last several years. It's been a hot topic in the Texas Supreme Court. I've been involved in cases all over the state of Texas addressing the Economic Loss Doctrine, have had varying results, and now we have some guidance. We have some guidance from the Texas Supreme Court in a couple of recent cases. Why does it matter in this case? Why is it so important? Because here, the case arose out of a contract between Pal-Con and Spectra to manufacture a regenerator and move it from point A to point B, from Texas to Pennsylvania. That's what the whole thing was about. That's why all these people were out there. That's why what happened when the accident occurred, we're moving this regenerator from point A to point B. The Economic Loss Doctrine, for many years, this court, Texas Supreme Court, other courts around the state, other courts around the country have addressed it and said, what are we looking at? What is the thing? What is the objective to be accomplished? We're not going to include in the Economic Loss Doctrine personal injury. We're not going to include damage to other property. Those are the two things we do not have in this case. If at the time of the accident, a person had been injured out on that highway when the regenerator hit the bridge, I wouldn't be bothering you with the Economic Loss Doctrine. We do not have that personal injury here. If there had been damage to you- Are you saying that the economic loss is the main issue that we need to act on? The Economic Loss Doctrine is a rendition point that this court could rule on. Yes, sir. Absolutely. The other thing that takes a case out of the Economic Loss Doctrine is damage to other property. Again, the cases are replete, both out of the Texas Supreme Court and this court as well, on what is that other property? What are we talking about? If the state of Ohio had come in and said, whoa, whoa, whoa, you guys hit our bridge, I wouldn't be bothering you with the Economic Loss Doctrine. We don't have either of those two things. We don't have personal injury. We don't have damage to other property. We've got a regenerator that hit a bridge as it was being transported from point A to point B. That is the crux of the plaintiff's complaint. That's the crux of the intervener's complaint, the Appellee's in this court. As a matter of law, I would argue that the Economic Loss Doctrine barred the negligence claims that were brought by the Appellee's against my client, Burt Wheeler. You think this is simply a contract case? I do, Judge. We just ignore the negligence. I don't think anything to do with this case. I wouldn't say we ignore it, but the question is, what is the pleading? Does the pleading fall under a breach of contract claim? Is there damage to . . . The pleading doesn't plead negligence, going under that bridge without checking with the people? Well, and that gets into . . . There's a little bit of overlap between my first and second points. That gets into a question of duty. What duty did my client, Burt Wheeler, have, and to whom did he owe that duty? The Appellee's are asking this court to create, essentially, a new common law negligence duty with respect to a pilot car driver and what that person is supposed to be doing out on the road. I don't think that's what the jury found, is it? Well, and the way the case was presented to the jury, I think, ties into that. I think it ties into it very, very importantly, because in the early stages of the case, during the pretrial conferences that took place on the phone, that's volumes two and three, the question arose, who is going to be submitted? At the time, Friends was the transport company that the PALCON had a contract with to move the Regenerator. Friends, in turn, contracted with Brantley. Brantley contracted with my client, Burt Wheeler, to provide pilot car services, not transportation services, but just to be that point person out ahead of the main truck. You have a contractual chain. The plaintiff sued all those people, did what they were supposed to do in suing them, but my argument is their remedy is a contractual claim against Friends. In fact, they asked for a default. The clerk entered a default, and it moved along toward trial with the discussion always going to be that their liability was going to be submitted to the jury, as well as Brantley. Brantley's liability was always going to be submitted to the jury. The question is how? There were breach of contract claims against Friends, and that moved along, and then suddenly here we are at the time of trial, Friends is not present, Brantley is not present, how do we submit this to the jury? Our statement to the trial court judge was, we have got to submit the liability, if we're doing it, under a negligence theory of all these different entities, but we did object at that time and say that's not the way to do it. The economic loss doctrine bars the claims against my client, because you've got a remedy, you go after Friends. Counsel, you mentioned the Texas Supreme Court, how do you reconcile, I guess it's a land STV. Yes, sir. How do you reconcile that opinion with the Chapman decision? One seems to help you, the other one seems not to help you so much. The cases, interestingly, turn on the facts. One of the statements the Texas Supreme Court made in the beginning of both of those cases is this is a fact-driven inquiry, we've got to look at the evidence, we've got to look at what was the thing. And candidly, Judge, that's no different than what this court has done in the past. Judge Rievele in 1991, in Nathaniel Shipping, it's 920 F. 2nd, 1256, there was a discussion and there was a majority and a dissenting split based on a split in what Texas courts had done up to that point, talking about a delay with the subcontractor. And again, you look at what is the thing, what is the thing being sued on, what is the contractual objective being accomplished? Judge Graves, your question is how do I reconcile them? The plaintiff, or excuse me, the appellees complain a little bit about, I relied on Chapman. So just to be clear, what you're saying is both results are correct under the facts in those specific cases. Exactly. That's exactly correct, Your Honor. In those two cases, Chapman involved a summary judgment and involved whether a homeowner stated a negligence claim for water damage to new construction to a house based on what the plumber subcontractor did. So you've got a plumber, he's got a subcontract with the general, he goes out there, he does some work, he does some shoddy work, it damages the entire house. Compare that to this case. If I were a component manufacturer, component supplier of the regenerator, and I did something wrong that damaged the regenerator, I might have a problem under Chapman. I don't have that here. I've got an entire regenerator, moving it from point A to point B. I'm not a component manufacturer, I didn't cause damage to other property. The thing was always the regenerator, moving it from point A to point B. And that's why the Texas Supreme Court's opinion in Chapman doesn't bother me, doesn't hurt me in this situation because I do not occupy that same subcontract position as a component supplier or person who created the bigger thing. The appellees criticized me a little bit for relying on the Dallas Court of Appeals opinion in Chapman, which went into those details and came up with a different end result. But we embrace the intermediate holding, we embrace the Texas Supreme Court's holding. The outcome changed based on the facts of that case, but it doesn't impact our position. It doesn't impact Burt Wheeler's position in this chain of events. Similarly, Land STV, the issue in that case was whether the rule, the economic loss rule, permits a general contractor to recover increased costs of performing its construction contract because he relied on a set of plans negligently prepared by an architect. In that case, the economic loss rule was, it supported, the Texas Supreme Court held that the application was supported in that case from recovering delayed damages from the owner's architect. In that case, they reversed and rendered. Same thing here. We're not talking about something outside of this thing we're talking about, outside of this contract, whatever it may be. We fall within both of those cases because of what we did. And what we did out there was to guide a car along. And that ties me into my second point, which also is a rendition point. It's issues two and three, that there's no negligence duty owed to Palcon or to Valley Forge, and further, there's no evidence that Mr. Wheeler . . . They were asked to determine whether the entities that were submitted were negligent, whether Mr. Maples, Brantley's driver, and Mr. Wheeler were negligent. I don't believe they were instructed what the duty was. And we argued in the trial court, I argue here, that there is no duty outside of what Mr. Wheeler was doing out there. The appellees conceded at trial that Maples and Brantley had a duty to control Wheeler, not vice versa. Not that Mr. Wheeler had a duty to control the things that were happening out there. They said that the driver of the vehicle that was transporting the regenerator, if a duty was owed, owed it . . . had a duty to control Mr. Wheeler, not vice versa. The alleged omissions that are in the plaintiff's live pleading at the time of trial, and I bullet pointed them in the opening brief, those are all omissions. Those are all things that they said Mr. Wheeler did not do, but should have done. Those kinds of things go more to a negligent undertaking theory, which was not pled at the time of trial. And that I've addressed in the brief at length. But let's talk about what he was doing out there. Let's step past and assume there is some sort of duty which we deny. What is the breach? What did Mr. Wheeler do that proximately caused this accident? There were two experts that offered testimony at trial. They both talked about the Ohio operational guide. They talked about the statutes that Mr. Wheeler was supposed to follow while he was out there. In particular, Mr. Maples, Brantley's driver, was supposed to follow while he was out there because he was the one that had the permit to operate. So what was Mr. Wheeler supposed to do as the lead escort driver? He was supposed to proceed at least 500 feet in advance of the vehicle that Maples was operating. And number two, he was to maintain radio contact with Maples. It is undisputed he did both of those things. The evidence at trial was that Mr. Wheeler was 2,500 feet, nearly half a mile, five times the required distance ahead of the vehicle at the time they came back onto the route. So he complied with that. Number two, it is undisputed that Mr. Wheeler said, there's a bridge coming up and my pole just hit it. So that means you're going to hit it. And I'm paraphrasing here, but the effect of that is he had 2,500 feet, half a mile, to stop the truck. The response from Mr. Maples, the driver of the truck, is too late, I'm going to hit it. The presumption is he made the choice to hit the bridge rather than possibly injure the people behind him, jackknife the truck and so forth. And that's a decision that Mr. Maples made. This is your under a negligence theory, he wasn't negligent. Exactly, exactly. The jury heard all that though. The jury heard that, but that goes actually to my point six, which I'm going to briefly mention. They didn't hear it from my client. My client did not have the opportunity to stand up in court due to medical issues. The trial judge allowed him to have a video deposition, but he wouldn't let us play it. What he allowed to come in was his narrative of the summaries that were prepared. That's all the jury heard. They never got to hear from my client. And I've cited the particular rule of federal civil procedure, I've cited the advisory committee notes on that, that that is a fundamental thing. The ability for my client to get up and tell his story in the order in which it happened and not have it be a narrative by a judge told at the beginning or read into the record by the appellees. Was there a motion for a continuance? I apologize, Judge? Was there a motion for a continuance? There was not a motion for continuance. There was an objection made at the time, wait a minute, the appellees are telling my client's story. This is not the time for that. So again, I've raised many issues for this court. The two primary issues are the rendition points, the economic loss doctrine, which I would argue is entirely consistent the way I argue it here with what the Texas Supreme Court has done, what this court has done in the past, what Texas law is. Thank you. All right, thank you, Mr. Rutherford. Do you save time for rebuttal? Yes, sir. Mr. Searcy? Good morning, Your Honor. May it please the court, counsel. Pilot. The very word to me connotates a position of responsibility, a position of competence, a position of prudence. But as I've heard the argument unfold this morning, apparently it entails nothing. The court and jury below correctly rejected those contentions. And I want to discuss nine factual points and ten bullet points in argument that will show that the trial court and jury's determination in this case should be affirmed. But before I do that, let me answer the question you posed to Justice Graves about the distinction between LANS, which was a claim by a general contractor against an owner's architect that that architect made defective specifications that caused it contractual harm in its relationship with the owner. That's LANS STV, a defective specifications case. Consider instead such cases as the recent Chapman Customs Home. Chapman's Customs Home involved a situation where a subcontracting plumber defectively did his work and damaged the property, like the regenerator here, of the owner. The Supreme Court of Texas just months ago said that claim by the owner for economic loss caused by that subcontractor in negligently performing the obligations he undertook under the subcontract are not precluded by the economic loss rule. End of story. So let me talk about the first of the nine points. My client, Palcon, custom manufactures huge pieces of equipment used on pipelines called regenerators. It is the only manufacturer of that product in the world. It operates at a limited facility in Stephenville, Texas, where it does this. In October of 2010, it contracted with an energy company in Lilly, Pennsylvania to custom build and transport and install one of these regenerators. It contracted with a company known as Friends to do this transportation. Friends in turn subcontracted with an entity named Bradley, a trucking company. On September the 9th, 2011. We know all the facts and we've read the briefs and part of the records, so you just need to tell us how the facts apply to the issues that have been raised on the panel. I don't want to bore the court with a recitation, but the critical stage is Bradley subcontracts with the pilot company, the appellant in this matter, to have it, help it transport the oversized load across the state of Ohio. Under Ohio law, as we all know, they had to follow a permitted route. The evidence is undisputed that the driver, Mr. Maples, missed an exit that took him off the permitted route. He contacts the pilot car driver, asks him to rejoin him when the truck is safely parked on the side. Mr. Searcy, we're just not interested in hearing you go back and go through all of the facts that we're well aware of. We're here to address the legal issues that the appellant has raised to try to overcome an adverse judgment. So if you would please, as the appellee, address those points, tell us how the facts that are already in the record, one way or the other, apply to the applicable law. I shall. And I'll talk to ten points then on that, Your Honor. First point. The economic loss rule does not apply. It's not applicable because Wheeler's duty arose as a common law duty, not under a contract with Palcon that was independent of the Palcon Spectra contract. It does not apply because Palcon's damages were damages to its physical property, not merely the economic loss of some potential contractual benefit. As to the common law duty, Wheeler assumed, under the clear law of the state of Texas, a common law duty under the Wheeler-Bradley contract, just as the Texas Supreme Court said in Chapman recently in 2004. Moreover, under a traditional analysis, given the foreseeability of damage to this property, the social utility of requiring a pilot car driver to exercise caution, the limited burden imposed upon him by having that duty imposed, and the consequences of not placing that duty on the pilot car driver, then clearly a common law duty exists in this case. What the jury found, what the court instructed, that Wheeler was directly liable, not vicariously at fault, is seen to be argued on appeal now. Section 314 of the Restatement of Contracts, which deals with a negligent undertaking by a bystander, which the pilot car driver clearly was not, has nothing to do with this case. Wheeler was not a mere bystander. This is not a negligent undertaking claim. Moreover, even if it were, as you read page 2958 of the record, the state of Texas has when the court submits its charge to the jury. There is no objection made to the court's charge under Rule 51 as to the absence of any instruction as to negligent undertaking. Indeed, there's no objection initially to any failure to include other parties that are allegedly proportionately responsible for something. So whatever existed as to that, it was wiped. Likewise, there was abundant evidence presented by two experts, Mr. Soreson and Mr. Brantley, to support the jury's determination that the pilot car driver, by failing to stay where he was once the truck was safely parked, by failing to notify authorities that the driver was off the permitted route, by accompanying the driver for 20 miles off the permitted route down Interstate 270, was negligent. Mr. Searcy, did Pell-Kahn ensure the regenerator during the course of this transporting? Was the regenerator insured? It was, Your Honor. Hence, Valley Forge is one of the parties in this case. And doesn't Land seem to suggest that where the parties can, on the front end, insure against some risk of harm or loss, then the economic loss doctrine should apply? I would not agree with that, Your Honor. I think the economic loss rule, whether there's insurance or not insurance, is irrelevant to application of the economic loss rule. With respect, Your Honor. Can I ask you a question about the damages? Yes, sir. Your client had to make a temporary replacement of what was damaged. As I understand, Judge McBride included all of the cost, that which was actually recovered because you were able to sell it for another party. That unit had to be rebuilt, Your Honor, before it was resold, as the jury heard. I'm talking only about the cost of the temporary construction itself. I understand, Your Honor. You're talking about the temporary replacement unit that was given to Specter, later brought back, later rebuilt, and resold then to Kinder Market. As the record reflects. The evidence ... I'm asking you if your cost in making the replacement was all recouped when you sold it eventually, but it is included in your damages that you owe to Wheeler. The answer is no, Your Honor. Why? The reason it is not is, one, after the unit was recouped from Specter, it was substantially rebuilt by Palkon, two ... The only replacement is the replacement of the original that was damaged? No, sir. There was a temporary replacement, is what you're talking about, I think. The temporary replacement, Your Honor, had to be rebuilt before it was resold to Kinder Market, as the evidence showed from Mr. Thompson. Well, did you get your cost of manufacturing the replacement from Kinder? No, Your Honor. That's why the jury awarded us that recovery. In other words, you have not been charged in this judgment with the cost that you incurred in manufacturing the replacement, not the original, but what you got from Kinder. The answer is, there is no offset for what the unit was resold for Kinder Market to, nor was there any claim of offset, but ... Offset? What I'm talking about, are you recovering twice for what it cost you to manufacture the replacement? No, Your Honor. No. And that's shown from the testimony of Mr. Thompson. It is shown what? From the testimony of Mr. Randy Thompson at the time of trial. So that that was not included in the damages you were looking for? It was included, but it is not a double recovery, is what I'm trying to say, Your Honor. Why is it a double recovery? It's not a double recovery because we did not recoup our entire cost of manufacturing the temporary replacement ... Oh, you didn't? No, when the unit was resold to Kinder Market. It's the difference. So you only recovered the cost that you weren't paid by Kinder? Correct, Your Honor. And that's clear in the evidence? That's what I certainly consider the evidence to show, and the jury did as well. Thank you. Thank you, Your Honor. When I ... Your Honor, indeed, there is an abundance of evidence, I think, to support the jury's damages award, both as to the permanent replacement unit and the temporary replacement unit, and as to the lost profits. As to the final matter ... So did you make a profit when you sold that temporary replacement unit? Did you make a profit on that sale? I'm sure they did. I'm sure they did. It's not enough? Not enough to recoup the cost, no. And when I ... let me ... Well, is that ... I mean, is that in the record? You're here to tell us what the record ... So you said, well, I'm sure they did, but are you assuming that, or, I mean, will ... No, I'm relying on what my recollection of Mr. Thompson's testimony was, and he was the person who testified in this matter, as well as the testimony of Mr. Arney, the defendant's testimony. No indication of any recoupment of the cost of the temporary module upon the resale of whatever was resold to Kinder Morgan. And so, to suggest that there was a profit, I suppose I misspoke there, because there wasn't a profit, because we didn't even recover what it had cost us to implant the temporary module in Lilly, Pennsylvania, as a rectification for the destruction of the original unit. Likewise, Your Honor, there is no indication of any foreclosure of Mr. Wheeler from testifying. He apparently, on the eve of trial, developed an inability to attend trial. The court allowed an out-of-time deposition to take his deposition because of his inability to be live. The deposition was taken. Summaries were made pursuant to the court's standing rule on the use of summaries. His deposition testimony was presented through that forum. A request was belatedly made, out of time, to utilize some undesignated portion of a videotape, and there's nothing in the record, no proffer, to show what that was or was not and how it differed from the summary. So, there was no foreclosure. Practically speaking, how does that work, the presentation of the summary? Is it read into the record by a reader? Yes. That is how it's done. And least there be any confusion, under the standing rules of the district court, summaries are always required for deposition testimony. And deposition summaries must be agreed to by the parties. And it's a trial mechanism and trial protocol that greatly expedites the presentation of evidence and clarifies and avoids accumulation or irrelevancy. There's also objection made to the fact that the court required parties to specify what were stipulated facts. Well, that's, again, to me, a wise procedure to follow to avoid accumulation, deviation, into redundant or irrelevant matters. So, there was no mistreatment of anyone during the course of this trial, and if it were, there was no error preserved as to any of it. Here, there was a clear record made, a charge submitted to the jury without a Rule 51 objection. At the time the case was submitted, in fact, no objection was made to anything until after the charge had already been read to the jury. And then there was only passing reference to some addition to the various parties that should be included in the jury instruction as to comparative fault. This is a clean record. It's a substantial, I mean, it's a clearly supported jury verdict, and the court should be affirmed. Thank you, Your Honor. All right, thank you, Mr. Searcy. Mr. Rutherford, you've saved time for rebuttal. Judge Reveley, Judge Graves, you both asked about double recovery and profit. I believe opposing counsel used the phrase extra profit. I don't know what extra profit is. I know what gross income is. You have operating costs. Whatever's left, that's your profit. I don't know what extra profit is, but what I do know is that during trial, Randy Thompson testified. This is in the record 3111 through 3112. PALCON sold the temporary regenerator to Kendra Morgan at a profit above and beyond any construction or repurposing costs. I'd call that a profit. And I'd not only call that a profit, I'd call it a double recovery. Appley's argued that the trial court allowed Mr. Wheeler's deposition to be taken immediately prior to trial because he's too ill to leave Kentucky. That is true, and we do appreciate that. There was not a continuance motion made. What we anticipated was going to happen is that we would put on the testimony of our client, that Mr. Wheeler would have the opportunity to tell his story through his advocates, the people who were in the courtroom fighting for him. That is not what happened. Appley's counsel read the summary of Mr. Wheeler's deposition testimony. The trial judge read a narrative of a summary in the trial judge's own words. Our trial counsel objected, advised the trial court we wanted to present all of Mr. Wheeler's deposition testimony by video. The trial court denied that request and allowed the Appley's to present all of my client's testimony by summary, and that's in the record at 3042. That fundamental issue going to Issue 6, the right to stand up in court or to have your advocate stand up in court, I think is crucial here because the story that was told to the jury was told entirely through the mouth of the other side. It was told entirely through the narrative of the trial court. We did not have that opportunity, and if the court does not reverse and render, we would ask that the court reverse and remand for my client to have that opportunity, to have his day in court. What part of the story, obviously the jury finds facts, it doesn't determine issues of law. So what part of the story, in your view, did the jury miss out on that would have caused it to render the verdict that it did? There are two aspects to that, Judge Smith. The first aspect is simply the function of the jury. We've got 12 people in a box who look at the video, who look at the person sitting in the witness stand. They judge the credibility. Here it would have been played by video. They would have had that opportunity. That's the first part. That's a fair answer, but, I mean, what issues of credibility were there? I mean, it seems to me that the basic facts of what happened on that highway or how the equipment was manufactured and so forth is basically undisputed except possibly for this double-counting issue. So what did the jury miss out on that would have made a difference? And that is the second part to my answer, Judge. And, candidly, we did not object during closing argument. I don't think I need to, but I'm answering the question. The second part of it is the last words the jury heard before they went into the jury box was testimony from opposing counsel who said, Burt Wheeler said, follow me, I'll show the way, I'll lead you. That's not what happened. That testimony is nowhere in this appellate record because those words never came out of Mr. Wheeler's mouth, never came out of Mr. Maples' mouth. There were two witnesses to that accident, the guy whose pole hit the bridge, Mr. Wheeler, and then Mr. Maples who made the decision that he couldn't stop and he was going to hit the bridge. Those were the two people out on the road that day. Neither one of them testified that it was Mr. Wheeler's fault. In fact, Mr. Maples, at the time of the accident, wrote on the invoice, and this is in the trial record, wrote on the invoice that he hit the bridge, that it was his fault. The jury never got to hear that. They never got to hear it from my client. But the jury did engage in some apportionment of fault. Correct. They did. They did. And that takes me to my last point, which is that apportionment of fault, Judge Graves. Why did the trial court, when faced with a jury verdict that apportioned 65% to Brantley, 35% to my client, then add another 65% through Friends? That is a serious apportionment problem. You've got 165% of the liability because the trial court simply slid the jury's verdict as to Brantley out of the way and inserted Friends in its place. So if the court does not reach the rendition issues, we would ask the court to remand for new trial on the additional issues preserved in the brief. All right. Thank you, Mr. Rutherford. Thank you.